James Blaine SHEAD, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–85–00595–CR to 05–85–00598–CR.

Court of Appeals of Texas, Dallas.

Feb. 2, 1988.

Rehearing Denied March 10, 1988.

**20**

Melvyn Carson Bruder, Dallas, for appellant.

Donald G. Davis, Sharon Batjer, Dallas, for appellee.

Before HOWELL, ROWE[1] and THOMAS[2], JJ.

THOMAS, Justice.

Appellant, James Blaine Shead, complains of four convictions of theft. In our cause no. 05-85-00597-CR, punishment was assessed at ten years' probation plus a $2,500 fine. Punishment of three years' confinement in the Texas Department of Corrections was assessed in each of the remaining cases. Finding no error in the judgments, we affirm.

On original appeal, this Court held that Shead's counsel was ineffective by failing to designate the statement of facts within the required time. Accordingly, the appeals were abated and returned to the trial court in order to allow Shead to obtain a statement of facts. *Shead v. State,* 711 S.W.2d 345, 346-348 (Tex.App.—Dallas 1986, pet. ref'd). Following abatement, a statement of facts, supplemental transcripts and new briefs were properly filed.

■ In the sole point of error now raised by Shead, it is contended that the evidence is insufficient to support the con-

victions. Specifically, Shead asserts that the State failed to adduce sufficient testimony to establish that the property found in his possession was the property alleged to have been stolen from Advance Transformer Company. The standard for appellate review of the sufficiency of the evidence in both direct and circumstantial evidence cases is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State,* 663 S.W.2d 455, 456 (Tex. Crim.App.1984); *Wilson v. State,* 654 S.W. 2d 465, 471 (Tex.Crim.App.1983). In analyzing the evidence in a circumstantial evidence case, this Court must determine whether the evidence supports a hypothesis other than the guilt of the accused. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Crim.App.1983) (on rehearing). Utilizing this standard, we now review the evidence of this case.

Raymond Ratliff, an acquaintance of Shead and the president of a lighting company, testified that in January of 1984, Shead called and offered to sell him an unlimited supply of fluorescent ballasts at one-half the wholesale price. This was one-half the price Ratliff customarily paid for such items. Shead, at this time, did not indicate where he was obtaining the ballasts, although in response to Ratliff's statement, "Sounds hot to me,", Shead responded that he did not want to talk about that.

Suspicious of the call, Ratliff telephoned the district attorney and a referral was made to the intelligence division of the Dallas Police Department. Ratliff was contacted by the police department and a meeting was arranged between Ratliff, Officer Charlie Jackson and a security officer for Advance Transformer Company. A plan of action was developed whereby Ratliff and Jackson would purchase ballasts from Shead and the purchases would be

---

1. The Honorable Gordon Rowe, Justice, succeeded The Honorable Cynthia Hollingsworth, Justice, at the expiration of her term on December 3, 1986.

2. The Honorable Linda Thomas, Justice, succeeded The Honorable Ted M. Akin, Justice, at the expiration of his term effective December 31, 1986.

recorded. Moreover, it was decided that Ratliff would tape record all further phone conversations with Shead.

All of the taped phone conversations were admitted into evidence, and during the first of these taped conversations, Shead referred to the ballasts as "Advance" brand. During this discussion, the following transpired:

"Mr. Shead: They'll [the ballasts will] be delivered to you. That's going to be a cash deal.

"Mr. Ratliff: Okay. No checks, just cash.

"Mr. Shead: Just cash, and I can get you all you want of them, unlimited supply.

"Mr. Ratliff: Unlimited supply.

"Mr. Shead: Now, Ray, I'm going to tell you the truth. Okay?

"Mr. Ratliff: All right.

"Mr. Shead: You and I are friends. I'm going to just lay it on the line. I've got a truck driver that's been calling on us for years and he's always bringing me something. I mean—just when he walked in here with about 25 pairs of walking shorts—

"Mr. Ratliff: Uh-huh.

"Mr. Shead: —for me, and blue jeans for kids. He's always coming by here dropping something off. Anyway, he has the deal.

"Mr. Ratliff: Yeah.

"Mr. Shead: All right. They're out of the warehouse here. *I mean the Advance people, sure don't want to tell anybody about it because I mean, I mean boy, you'll get him in trouble sure enough. I'll just be honest about it.*

"Mr. Ratliff: Yeah.

"Mr. Shead: I can get all you want of them.

"Mr. Ratliff: Yeah.

"Mr. Shead: I can get all you want of them.

"Mr. Ratliff: Well, all righty. Check on those two and we'll go from there.

[Emphasis added.]

In another conversation, Shead stated that a certain type of ballast which Ratliff had requested was "stashed away." In a subsequent discussion, Shead described how he had gotten involved with the sale of this merchandise:

"Mr. Shead: . . . I'll just tell you the whole deal. Okay?

"Mr. Ratliff: All right.

"Mr. Shead: The guys in the warehouse that works with Advance—

"Mr. Ratliff: Okay.

"Mr. Shead: —they're getting the stuff out of there. My friend works for a freightline.

"Mr. Ratliff: Yeah.

"Mr. Shead: He comes by there, calls on them all the time. Okay. And, you know, picks up freight. They were using him. In other words, they were saying, "We want to get rid of this stuff. Have you got any buyers for it?" And he was coming to me because we're friends; and then all of a sudden they wanted to warehouse some stuff that they wanted to get out of there; and he brought it over here; and I warehoused them and they paid me to warehouse them.

"Mr. Ratliff: Uh-huh.

"Mr. Shead: Then he said to me, "Blaine, do you know anybody that will buy this stuff?" I said, "You know, I don't know many electricians and people like that, but I do know one man that might buy these"; and that's when I called you.

In a later conversation, Shead encouraged Ratliff to place larger orders because Shead "never [knew] when this thing [was] going to blow up."

Ratliff described the two instances in which he bought ballasts from Shead, on February 2, 1984, and February 20, 1984. These two "purchases" are the basis of two of Shead's convictions. Ratliff testified that on February 2, 1984, he purchased twenty-two cartons of HM–1P–20–TP ballasts and eighteen cartons of HM–140–TP ballasts, and that on February 20, 1987, he purchased eleven cartons of R–2S–35–TP ballasts. These model numbers and quantities were the same as those alleged in the indictments. Through Ratliff's testimony, it was established that the value of the ballasts obtained in the purchases was

within the range set out in each of the indictments.

Officer Jackson testified that on February 29, 1984, and March 8, 1984, he purchased two groups of ballasts from Shead. These transactions form the basis of Shead's other two convictions. The evidence established that Officer Jackson bought five cartons of SM–2E–75–STP ballasts on February 29, and ninety cartons of SM–2E–75–STP ballasts and forty-two cartons of RQM–2S–40–TP ballasts on March 8. These model numbers and quantities were the same as those alleged in the indictments.

It was further established through Officer Jackson that two of the warehouse employees at Advance Transformer Company had taken the property and forwarded it to a truck driver, Morris Brewer, who in turn stored the merchandise in Shead's warehouse. Brewer then enlisted Shead's help in selling the ballasts. Officer Jackson related in one conversation with Shead and Brewer, that one of them stated that they were "not dealing with this legally." Officer Jackson further explained that during other conversations, both Shead and Brewer alluded to the same thing. According to Officer Jackson, Shead related that one-third of the proceeds from the sale of this merchandise was shared between Shead and Brewer and two-thirds were shared between the warehouse employees.

Officer Jackson also explained that some of the property in the warehouse of Advance Transformer Company was marked, specifically the items that Ratliff was attempting to buy. After observing the February 20 purchase by Ratliff, Officer Jackson saw some of the marked items in Ratliff's warehouse.

All of the purchases were observed by Officer Jackson and he testified that the property recovered from the four purchases was marked with "Advance" and all of the items came from the Advance warehouse. Further, based upon his visual inspection, Officer Jackson was sure the ballasts were brand new and from Advance Transformer Company. Moreover, we note that our record includes video tape recordings of each of the four sales. At the end of the fourth sale, the camera scanned several boxes at Shead's place of business and all were marked with the name "Advance Transformer Company."

James Krupka testified that he was the distribution center manager in Dallas, Texas for Advance Transformer Company in early 1984. According to this witness, the company had become suspicious of thefts in the warehouse as a result of an inventory conducted in November 1983. Krupka was contacted by the district attorney's office and the Dallas Police Department in early 1984, and as a result, he attended a meeting with Ratliff, Officer Jackson and Officer Padilla. After other meetings with the police officers, Krupka had a video monitor installed in a targeted area of the warehouse. Pursuant to instructions from the police department, the company also began marking certain boxes of ballasts.

According to Krupka, he observed the video tape of the February 2 purchase and he actually saw the property which was involved in the March 8 transaction. Krupka identified the two employees who were taking the merchandise. The evidence established that Krupka was familiar with all of the property which was involved in the four purchases. During testimony, Krupka stated that he did not authorize any of the property involved in these purchases to be taken and he had a greater right to possession than Shead, Brewer, or the warehouse employees.

Shead's argument essentially relates to the State's alleged failure to establish that the property possessed by him was stolen from James Krupka or Advance Transformer Company. We note that each of the indictments alleges that the owner of the property was Krupka. Shead points out that no ballast or box of ballasts was introduced in evidence at trial. Further, there is no testimony as to serial numbers on any of the ballasts possessed by Shead. It is contended that in order to sustain a conviction for theft, it is incumbent upon the State to identify the stolen property and to prove that the property alleged to have been stolen was in fact stolen. *York*

*v. State,* 511 S.W.2d 517, 518–19 (Tex.Crim. App.1974); *Nichols v. State,* 479 S.W.2d 277, 278 (Tex.Crim.App.1972). We agree that this is the holding of *York* and *Nichols,* but we disagree with Shead's point.

In *York,* the court considered a situation in which the appellant was accused of stealing a barricade blinker light from a road under construction and held that the evidence was insufficient to prove that the blinker was the identical one taken from the burglarized place. The subject light was never introduced into evidence. The president of the company from which the blinker was allegedly stolen never saw the light in question and further testified that between 400 to 500 such lights were stolen each month. The evidence further established that the light in question might have been retrieved from the police department by an unknown employee but no one was sure of its present location since there were no identifying marks placed upon the blinker. The court held that, because the blinker light was not in evidence and was not identified by the complaining witness *or by any other witness at trial as being the light of that company,* the property was not identified as the identical property taken from the theft scene.

In the instant case, other witnesses testified that the ballasts were from Advance Transformer Company. Officer Jackson testified that all of the property taken was in boxes marked from the "Advance Warehouse." He further testified that, based upon his visual inspection, he was certain that the ballasts were new and from "Advance." Also, the video tape recording of the March 8 transaction shows several boxes from Advance Transformer Company at Shead's place of business. Furthermore, in the first telephone conversation between Shead and Ratliff, Shead says that the ballasts were "Advance" brand. Thus, we can infer from this testimony that the ballasts were from Advance Transformer Company. *See Freeman v. State,* 654 S.W.2d 450, 454 (Tex.Crim.App.1983); *Ex Parte Watson,* 606 S.W.2d 902, 905 (Tex.Crim. App.1980) (as a general rule, any ultimate fact may be established by circumstantial evidence from which the trier of fact may draw reasonable inferences).

Turning to the testimony which establishes that the ballasts were *stolen* from Advance Transformer Company, we note that Krupka testified that he was familiar with the property involved in the four purchases. He testified that he observed the video tape of the first purchase and personally saw the property in the last purchase. Krupka stated that he did not give Brewer, Shead, or the warehousemen consent to take any of the ballasts involved in these transactions and he did not sell any such items to Shead.

Further, when Ratliff stated that the items sounded "hot" to him, Shead did not want to discuss that matter. During the various phone conversations, Shead repeatedly indicated the nature of these transactions and how all of this was being accomplished. Finally, in the video tape recording of the February 29 purchase, Shead stated: "They're stealing them right out of the warehouse, I don't mind telling you." We conclude that the testimony of Officer Jackson, Ratliff and Krupka and the various statements by Shead, taken together, establish that the ballasts being sold by Shead were stolen from Advance Transformer Company.

Shead also complains that the testimony of Officer Jackson and Krupka regarding the location of the property after the purchases were made is contradictory. Officer Jackson testified that the property was stored at the police department while Krupka stated that some of the property was returned to him. We hold this difference to be insignificant. The question is whether Shead sold the same property that was stolen from Krupka—not the locations of the property after Shead was arrested. Furthermore, the trial court is entitled to accept one version of the facts and reject another or reject any of a witness' testimony. *See Johnson v. State,* 571 S.W.2d 170, 173 (Tex.Crim.App.1978); *Thorn v. State,* 651 S.W.2d 39, 41 (Tex.App.—Dallas 1983, pet. ref'd).

Accordingly, we hold that the evidence is sufficient for a rational trier of fact to find

the essential elements of the crimes beyond a reasonable doubt.

The judgments of the trial court are affirmed.